**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )          **Criminal ACTION**
                                   )
v.                                 )          No. 13-10036-01-MLB
                                   )
CECELIA MARIA AISPURO,             )
                                   )
                    Defendant.     )
_____)

**MEMORANDUM AND ORDER**

        This case comes before the court on defendant Cecelia Aispuro's
motion to suppress. (Doc. 17). The Government has filed multiple
responses (Docs. 20, 22), and defendant has filed additional briefs
as well (Docs. 21, 28). The court held an evidentiary hearing on July
10, 2013, and the motion is ripe for decision.

**I. FACTS**

        The court finds the following facts from the evidence presented.
On March 6, 2013, Kansas Highway Patrol Trooper Lee Rose was on duty
patrolling U.S. Highway 50 in Edwards County, Kansas. The highway in
that area generally has only two lanes – one for eastbound and one for
westbound traffic – but it has additional "passing lanes" at periodic
intervals. Around 2:30 p.m., Rose was traveling east behind a semi-
trailer when he came to one of the passing areas. As he moved left
into the passing lane to go around the truck, he saw two vehicles
ahead of him traveling eastbound within the passing area.

        One of cars was a silver sedan traveling in the left passing
lane. A red van was traveling in the right lane some distance ahead
of it. As Rose passed the semi-trailer, he judged that the silver car

was not gaining on or passing the red van but was traveling along behind it in the left lane. Where a highway such as this has two lanes for travel in the same direction, Kansas law generally requires vehicles to be driven in the right lane except when overtaking and passing another vehicle or when preparing to make a left turn.[1] (These cars had all just passed a road sign before entering the passing area which stated, "Keep Right Except to Pass.")[2]

The silver car – a Hyundai Sonata – signaled and moved over to the right lane as Rose got closer to it. The Sonata then followed along behind the red van in the right lane. Rose stayed behind the Sonata as the passing lane ended. He ran a check on the Sonata's California license plate. The check showed nothing unusual. Rose then activated his emergency lights to stop the car. The alleged violation and the stop were captured on the patrol car's video recording system; the recording was admitted into evidence at the suppression hearing.

Rose approached the passenger side and spoke to the driver, defendant Cecelia Aispuro, who was the sole occupant. When he explained it was unlawful to travel along in the left lane, defendant said, "Oh, okay," and apologized. Rose quickly told her he was only going to give her a warning for the violation. He asked briefly about her travel plans. She said she was coming from California and was going to Minnesota. When he asked where in Minnesota, she hesitated and said she was going to see some friends. When Rose asked if the car was hers, she said no, it was her uncle's. When asked his name

---

[1] K.S.A. § 8-1522(c).

[2] K.S.A. § 8-1507 generally requires the driver of a vehicle to obey the instructions of any applicable traffic control device.

defendant responded, "Fernando."

Rose obtained defendant's license, registration and insurance information, and returned to his car to run a check. Defendant had a Nevada driver's license. The car was registered and insured in California in the name of Alejandra Cossio. It had been registered and insured on February 5, 2013 – about one month prior to the stop. Dispatch subsequently informed Rose that defendant's Nevada driver's license was suspended.

Rose returned to defendant's car and asked if she knew about the suspended license. When she indicated she did not, he suggested that perhaps she had neglected to pay a ticket. Defendant said she had received a ticket for not having insurance but had sent the payment in. Rose said it could be an error and told her he was not going to arrest her (although Kansas law does give him discretionary authority to make such an arrest). Defendant asked if she could still drive to Minnesota, but Rose said she probably was not going to be able to and asked if she knew someone in the area to call.  While he was at the passenger window, Rose could smell air freshener and could see two "pine tree" air fresheners hanging from the steering column. He also saw a single small travel bag on the passenger seat. Rose asked who she was going to meet in Minnesota, to which defendant said, "My friends." When he asked how her trip came about, defendant said she had just visited her sister in Arizona and had made arrangements over the weekend to visit her friends. After additional brief conversation, Rose said he would go finish up his paperwork and then they would figure something out.

Rose returned to his car to complete a warning citation. A few

minutes later, KHP Motor Carrier Inspector Ralph Jantz arrived on the scene, perhaps at Rose's request, and parked behind Rose.

Rose completed his paperwork and returned to the Sonata, giving defendant a warning citation and returning her documents. Rose asked if she had any other questions. Defendant asked if she needed to have someone else drive. Rose said that legally he could not give her permission to drive but recognized that she was "in a bind." He intimated he would understand if she decided to keep on driving, saying if she drove and somebody else stopped her "there could be consequences." He added he would be happy to call someone if that would help, but defendant responded that she did not know anyone in the area. Rose verified that she had a phone and said "it is going to be your choice" – meaning whether or not to drive – and that if she chose to do so "that's going to be on you." Rose ostensibly concluded the stop, told her to have a safe trip, and stepped back toward his patrol car. After a momentary pause he returned to the open passenger window and asked defendant if he could ask a couple of questions before she took off. She agreed to do so.

Rose testified there were several circumstances that in light of his training and experience made him suspect the defendant was using the car to transport drugs or drug proceeds. These included: the presence of strong air freshener in the car, which he said drug traffickers sometimes use to mask the scent of drugs; the fact that defendant had recently gone from Arizona to California (which he identified as a common source area for drugs) and borrowed the car for this trip; the fact that she had only a small overnight bag visible in the car; the fact that the car was only recently registered, given

that Rose knew it was common for drug smugglers to purchase vehicles just prior to using them to transport drugs; the fact that defendant misidentified the owner of the car; the fact that the registered owner was not present; and defendant's apparent inability or reluctance to say where in Minnesota she was headed.

Rose asked defendant if there were guns, drugs or anything illegal in the car. When she denied it, Rose again asked about ownership of the car and how she acquired it. Defendant indicated she had just borrowed the car from her uncle for this trip. She identified him as Fernando Gomez. Rose asked if she would give him consent to search the car; she immediately responded, "Sure." He added, "You don't mind?", to which she responded, "Oh no, go ahead." Rose had defendant get out of the car and come behind it. She picked up her cell phone, got out of the car, and put the cell phone in her pocket. It was extremely cold outside and Rose said he would have her sit in his patrol car "just so you don't freeze to death." She asked if he wanted the keys to the trunk. He said yes, and defendant handed him the car keys. Rose asked defendant if she would mind if he set her cell phone in the Sonata, saying it was for his safety.[3] She said "sure" and gave him the phone. He took the cell phone and had Jantz put it in the Sonata. Rose had defendant sit in the front passenger seat of the patrol car. He told her he would lower the window a bit and said to let him know if she needed anything. The patrol car door

---

[3] Rose testified he wanted to keep defendant from contacting any escort vehicle that might be traveling with her, thereby preventing any interference with the search by other persons. He also wanted to preserve evidence by keeping defendant from deleting any information on the phone relating to drug trafficking.

was not locked.

Rose, joined by Trooper Jantz, went to defendant's vehicle and began searching, starting with the trunk. Rose then got in the front seat, where he soon identified a suspicious looking area and eventually discovered what he identified as a non-factory installed false compartment under the carpet in the floor of the front passenger area. It was partially under the passenger seat and appeared to have a covering secured by some bolts. This was about twenty minutes after the initial stop. He could see that the floor had been built up several inches to the point where it almost touched the bottom of the passenger seat. After extensive poking and prodding, Rose concluded they would likely have to take the passenger seat out to get access to the compartment. He moved the black nylon bag from the front seat to the back. Rose and Jantz discussed where they could take the car to complete a search and who might be available to help, because if they moved the car Rose wanted a law enforcement officer to drive it. Jantz placed a call for another trooper to come assist.

Rose returned to his car and read defendant her <u>Miranda</u> rights. She asked if he were going to arrest her, to which he responded, "Not yet." When she asked what that meant, Rose first verified that she understood her rights, which she said she did. He then said there was "something about your car that we need to check out." In response to additional questions she said she had borrowed the car from her uncle. She said she did not know who owned it, but said "it's his" [her uncle's] so she believed he owned it. Defendant, who was recently unemployed, said she was "meeting up" with her friends in Minnesota "just to hang out" because they had decided over the past weekend to

-6-

take a road trip. Rose said they had some problems with the vehicle they needed to check out, to which defendant said, "Okay, that's fine." When she saw them gathering up tools for the search, defendant asked Rose if they were going to break something in the car. Rose said they wouldn't do anything they couldn't fix, but added if they did so they would pay to fix it, to which defendant said, "okay."

Jantz took some pictures of the compartment area, after which Rose retrieved a ratchet to remove the bolts. Working mostly from his knees on the shoulder of the roadway and with some difficulty, Rose was eventually able to get partial visual access to the compartment, although it was somewhat obstructed by the passenger seat. Rose and Jantz at first attempted to remove the seat but were unable to do so. They eventually determined, after extensive efforts, that the compartment was empty. Rose considered taking the center console apart as well because it appeared to have some non-factory screws, including one or more with tool marks, which indicated the screws had been taken out at some point. While he was searching, Rose took note of some receipts in the car including one indicating a money transfer from Mexico and another indicating defendant had stayed in Las Vegas. A little more than 40 minutes into the stop Rose moved defendant to Jantz's car so that he could use the radio and his cell phone without defendant overhearing his conversation.

Rose was informed by dispatch that authorities were looking for a place for him to move the Sonata to complete the search. They also told him the troopers he had requested were on the way. Rose asked the dispatcher to run the vehicle through "EPIC." Jantz, meanwhile, continued searching the car. Rose contacted DEA Task Force Agent Lt.

Doug Rule, explaining that they had a car traveling from California to Minnesota with an empty false compartment in it. He said he hadn't yet talked extensively to defendant and hadn't completed a thorough search of the vehicle. Rose said if it turned out the vehicle was not involved in an active case (apparently referring to his EPIC inquiry), they would probably keep the car and turn the defendant loose. Either Rose or Rule contacted DEA Special Agent Erik Brown in Garden City about the situation. A short time later dispatch informed Rose that there was "an active criminal case" on the Sonata.[4]

A determination was made to move the Sonata to a County highway department maintenance garage in nearby Kinsley to do a complete search and to talk to the defendant. KHP Trooper Ashley Martell and her training supervisor, Master Sergeant Terry Stanton, arrived on the scene. Rose had Trooper Martell pat down the defendant before Rose transported her in his car. Another officer drove the Sonata to the garage as part of what was now a four or five vehicle caravan. This was a little over an hour after the initial stop. On the way to the garage Rose remarked to defendant that by now she had obviously figured out that "something was going on ... that something was wrong with the car" and that they were going to go up here and talk about it. He told defendant she was not under arrest. Defendant asked if the car were stolen; Rose said "no, that's not it." They proceeded a few miles in to town to the maintenance garage, arriving around 3:50 p.m.

When they arrived Rose told the other troopers to start looking through the vehicle but "don't tear it up yet" or "be gentle" until

---

[4] There was no evidence at the hearing explaining "EPIC" or the significance of an "active case" on the car.

he talked to the DEA. Rose sat and talked with defendant in a Chevy Tahoe parked inside the garage next to the Sonata. Troopers Martell and Stanton started to search the Sonata. Martell understood from Rose that defendant had consented to a search and that they were looking for evidence of narcotics trafficking. Martell testified it was difficult to see in the hidden compartment and she could not tell how far back it went. The troopers looked the car over, including under the hood, for evidence of other compartments. Martell soon got in the back seat and opened the black nylon bag on the seat. It was fairly small and had a "Betty Boop" figure on it. Inside the bag Martell first found some cash, which she gave to Jantz to count and to log, and then found a small clear plastic bag containing a white powder, which she believed to be illegal drugs. She notified Rose of this and continued to look in the bag. After finding some women's clothing, which she took out and laid aside, she found several large cellophane-wrapped packages which she believed to contain drugs. The contents were later tested and determined to be nearly four pounds of methamphetamine.

Rose formally placed defendant under arrest after the drugs were found. He also notified Agent Brown with the DEA. Rose told defendant they had found drugs inside the bag and asked if the bag was hers. She told Rose she got the bag from her sister in Arizona, where defendant had stopped for three hours. Defendant said she thought that it had cheese in it from Mexico, but added that she knew something was wrong with it. Defendant also answered additional questions about her travel.

DEA Agent Brown arrived at the garage from Garden City at around

-9-

6:00 p.m. Rose briefed him and gave him defendant's cell phone. The phone had apparently been in Rose's possession or control ever since he obtained it from defendant at the outset of the search. Brown took the phone and connected it to a device to download information from it. The device gave Brown a menu of items to choose from that could be downloaded. He elected to copy the phone's contacts, call logs, text messages, and photos. The device indicated it could not copy or download (at least not completely) certain other items, including instant messages, video, and images. Brown knew defendant had been given Miranda warnings previously and he asked her if she understood the warnings. She said she did. He asked if she wanted to speak to him, but she declined. He ceased attempts to interview her at that point. The information from the phone was analyzed several days later. It included potentially incriminating text messages and photos.

Defendant was offered an opportunity to testify and call witnesses at the suppression hearing. She acknowledged her understanding that she could do so but declined.

## II. MOTION TO SUPPRESS

Defendant's motion to suppress argues the following: 1) the initial stop was unreasonable because defendant was lawfully attempting to pass another car when Rose first saw her in the passing lane; 2) Rose unlawfully detained defendant without reasonable suspicion after he issued a warning citation and the ensuing encounter was not consensual; 3) after Rose concluded the hidden compartment was empty his reason for detaining the defendant "was exhausted" and the continued detention was unreasonable; 4) defendant's rights were violated when she was questioned without <u>Miranda</u> warnings after being

-10-

arrested at the maintenance garage; and 5) the warrantless search of defendant's cell phone violated the Fourth Amendment.

## III. DISCUSSION

A. <u>Initial Stop</u>. A traffic stop is reasonable under the Fourth Amendment if the officer's stop of the vehicle was justified at its inception and was reasonably related in scope to the circumstances that justified the stop in the first place. <u>United States v. Winder</u>, 557 U.S. 1129, 1133-34 (10th Cir. 2009).

A traffic stop is justified at its inception if the officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that the motorist has violated any of the traffic or equipment regulations of the jurisdiction. <u>Winder</u>, 557 F.3d at 1134 (citing <u>United States v. Martinez</u>, 512 F.3d 1268, 1272 (10th Cir. 2008). Trooper Rose's stop of defendant's vehicle was justified at its inception because he had a reasonable suspicion defendant was violating K.S.A. § 8-1522 and K.S.A. § 8-1507 by traveling in the left passing lane. Although defendant argues she was overtaking the van in front of her when Rose saw her, Rose could reasonably conclude otherwise from what he saw and could reasonably believe defendant was traveling along behind the van. Not only does the videotape of the stop provide some support for Rose's conclusion, but defendant's later apology to Rose when he explained the Kansas law suggests she had not been in the left lane for the purpose of passing the other vehicle. At any rate, even if a full inquiry were to show that Rose's belief was actually mistaken or that reasonable doubt exists as to whether or not defendant was overtaking the other

-11-

vehicle, this would not render the initial stop of the vehicle unreasonable:

> An officer's objectively reasonable mistake of fact may support the reasonable suspicion or probable cause necessary to justify a traffic stop. That an officer's suspicions may prove unfounded does not vitiate the lawfulness of a stop, provided the officer's error was made in good faith and is objectively reasonable under the circumstances. Police errors, in this context, are simply unavoidable, as reasonable suspicion involves "probabilities" rather than "hard certainties."

Winder, 557 F.3d at 1134 (citations omitted). See also United States v. Parada, 289 F.Supp.2d 1291, 1300 (D. Kan. 2003) (reasonable suspicion "requires less proof than probable cause and much less proof than beyond a reasonable doubt that a traffic violation occurred."). Rose had a particularized and objectively reasonable basis for believing defendant was violating the traffic laws, and his initial stop of the vehicle was lawful under the Fourth Amendment.

B. Detention. Defendant does not challenge the scope of the detention while Rose was writing up and giving her a warning citation, but she argues Rose unlawfully extended the detention and denies that the encounter was consensual after the citation was given. She contends Rose "made clear that the defendant was not free to drive away" and she therefore did not feel to leave "as long as she remained under the cloud imposed by the officer." She further contends the initial detention from the traffic stop never ended. (Doc. 17 at 3-4).

An officer may extend a traffic stop beyond its initial scope if the motorist consents to further questioning or if the officer has a particularized and objective basis for suspecting the person of criminal activity. United States v. West, 219 F.3d 1171, 1176 (10th

Cir. 2000). A traffic stop may become consensual, requiring no reasonable suspicion, if the officer returns the person's documents and asks questions without further constraining the driver by an overbearing show of authority. A consensual encounter is the voluntary cooperation of a person in response to non-coercive questioning by a law enforcement officer. Whether an encounter can be deemed consensual depends on whether the officer's conduct would have conveyed to a reasonable person that she was not free to decline the officer's requests or otherwise terminate the encounter. <u>West</u>, 219 F.3d at 1176 (citations omitted).

Rose returned all of defendant's documents and objectively indicated the stop was over, wishing her a safe trip and starting to walk back toward his car. Before she could leave, he reappeared at the passenger window and asked if she would mind answering some questions. Her response, which is audible on the recording of the stop, indicates a ready willingness to stay and talk. Trooper Rose was unfailingly polite to defendant throughout this encounter. The circumstances show that defendant's willingness to stay did not result from any improper police coercion or belief that she was not at liberty to go if she wanted. Rose gave her no objective reason to think she was not free to decline to stay and talk.

Defendant's claim that the trooper restrained her by telling her she was "probably not going to be able to drive" is not persuasive. First of all, there is no credible evidence that defendant's license was not actually suspended or that the trooper's statements about driving on a suspended license were incorrect. And although Rose initially told defendant she "probably" was not going to be able to

drive, and later that he could not "legally" give her permission to drive, he all but granted express permission – with his "understand[ing]" that she was "in a bind" and recognition that she might "choose to" drive – and simply warned her she might face penalties if she did so and got stopped by someone else. Not only was there no "cloud imposed by the officer," the officer's exercise of clemency refutes the claim that he detained her by a show of authority. "So long as a reasonable person would feel free to disregard the police and go on about his business, the encounter is consensual and no reasonable suspicion is required." Florida v. Bostick, 501 U.S. 429, 434 (1991). Rose did not say or do anything to suggest to defendant that she was not free to disregard his request or terminate the encounter. The totality of circumstances shows that the encounter was consensual when defendant agreed to stay and talk with Rose.

Even had the encounter not been consensual at that point, Rose was aware of facts sufficient to justify an investigative detention. "To initiate a seizure by means of an investigative detention, an officer must have an articulable and reasonable suspicion that the person seized is engaged in criminal activity." United States v. Madden, 682 F.3d 920, 925-26 (10th Cir. 2012) (citation omitted). Reasonable suspicion is "something more than an inchoate and unparticularized suspicion or hunch," but "is considerably less than proof by a preponderance of the evidence or [proof] required for probable cause." United States v. Chavez, 660 F.3d 1215, 1221 (10th Cir. 2011). Rose identified several circumstances that led him to suspect the defendant was using the car to transport drugs or drug

proceeds, including the heavy use of air freshener; the recent registration of the car; defendant's misidentification of the registered owner; the absence of the registered owner; defendant's unusual travel plans originating out of California, a source state for drugs, and her failure to identify a particular destination in Minnesota. Rose explained how his training and experience – including extensive experience in drug interdiction – led him to suspect criminal activity was afoot. His reasonable judgment about the significance of such facts is entitled to deference. United States v. Jones, 701 F.3d 1300, 1316 (10th Cir. 2012) ("deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions"). Cf. United States v. Ludwig, 641 F.3d 1243, 1249 (10th Cir. 2011) ("we have often held" that driving a vehicle registered to a non-present party may "indicate a stolen vehicle or drug trafficking"); United States v. West, 219 F.3d 1171, 1178 (10th Cir. 2000) ("The Tenth Circuit has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis."); United States v. Simpson, 609 F.3d 1140, 1151 (10th Cir. 2010) (vague or implausible travel plans can contribute to reasonable suspicion). Taken as a whole, the circumstances justified a brief detention to investigate the circumstances of defendant's trip or to ask for consent to search the vehicle.

C. Consent to Search. A law enforcement officer may conduct a warrantless search of a vehicle if a person in control of the vehicle has given voluntary consent to the search. United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001). Whether consent is

-15-

voluntary is determined by the totality of the circumstances. To meet its burden in this regard, the Government must show that the consent was unequivocal and specific and that it was freely given, without implied or express duress or coercion. <u>Zubia-Melendez</u>, 263 F.3d at 1162.

The totality of circumstances shows that defendant voluntarily consented to let Rose search the car. Once defendant agreed to stay and answer questions, Rose asked about guns and drugs and, in short order, asked for permission to search the car. Defendant unequivocally gave permission, responding without hesitation (and rather enthusiastically) to Rose's request. The evidence shows her positive response was not the product of any show of authority or coercion by Rose. As noted above, defendant's suspended license was not a circumstance created by the trooper and was not used by him as leverage to gain consent. The only arguably coercive circumstance was the presence of a second patrol car and trooper (Jantz) at the scene, but the evidence indicates this had no influence on defendant's decision to consent. In sum the court finds defendant voluntarily gave consent to search the vehicle.

While this finding makes clear that the officers had lawful authority to initiate a search of the vehicle, the court notes that defendant lacks standing to claim otherwise. "A defendant does not have standing to contest a search where he does not establish a link between himself and the registered owner" of a vehicle. <u>United States v. Eckhart</u>, 569 F.3d 1263, 1275 (10th Cir. 2009). There was no evidence here of any connection between defendant and the registered owner. Defendant concedes as much and accordingly limits her challenge

on this point to the officers' detention of her while they searched the car. As indicated above, however, the court finds there was no detention initially: defendant agreed to stay and talk to Rose and gave permission for him to search the car.

D. <u>Continued detention/search</u>. After the officers located the hidden compartment, Rose administered <u>Miranda</u> warnings to defendant, although he told her she was not under arrest. Defendant argues the fact that the compartment was subsequently found to be empty "exhausted" any basis the officer had for detaining her and rendered her subsequent detention unlawful.

The court concludes the officers had probable to continue searching the vehicle even after they determined that the compartment was empty. The court similarly finds the officers had probable cause to believe defendant had committed or was committing a crime after they found the hidden compartment, including after they determined the compartment was empty.

"A police officer may conduct a warrantless search of an automobile if there is 'probable cause to believe that the vehicle contains contraband or other evidence which is subject to seizure under law.'" <u>United States v. Alcaraz-Arellano</u>, 441 F.3d 1252, 1261 (10th Cir. 2006). "It is well established that evidence of a hidden compartment can contribute to probable cause to search." <u>United States v. Jurado-Vallejo</u>, 380 F.3d 1232, 1238 (10th Cir. 2004). Whether probable cause can be based on evidence of a hidden compartment generally depends on two factors: 1) the likelihood that there really is a hidden compartment; and 2) the likelihood that a vehicle with a hidden compartment would, in the circumstances, be secreting

contraband. <u>Jurado-Vallejo</u>, 380 F.3d at 1238.

The officers here confirmed the presence of a non-factory installed hidden compartment, one that almost certainly was designed to carry contraband. Indeed, "it is hard to conceive of a legitimate use for a large hidden storage compartment in any vehicle." <u>Jurado-Vallejo</u>, 380 F.3d at 1238. This particular compartment – which was covered with sheet metal, bolts, adhesive and carpet – was clearly not for the legitimate purpose of hiding everyday valuables that one might temporarily leave in a car. At that point the officers clearly had probable cause to search the vehicle. <u>Jurado-Vallejo</u>, 380 F.3d at 1238-39. Their authority to search extended to every part of the vehicle that could contain items related to drug trafficking. <u>United States v. Ross</u>, 456 U.S. 798, 825 (1982) ("[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."); <u>United States v. Alcarez-Arellano</u>, 441 F.3d 1252, 1261 (10th Cir. 2006). Once the compartment was found to be empty, the probable cause determination turned on the likelihood that contraband or evidence of drug trafficking would be found elsewhere in the vehicle. The court concludes that the facts known to the officers at that point warranted a search of the remainder of the vehicle. An officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present. <u>Florida v. Harris</u>, 133 S.Ct. 1050, 1055 (2013). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence ... have no place in the [probable-

cause] decision"; all that is required is the kind of "fair probability" on which reasonable and prudent people act. Harris, 133 S.Ct. at 1055.

The discovery of the hidden compartment provided powerful if conclusive evidence that the car was intended for use in drug trafficking. It changed the calculus from one of suspicion of drug trafficking to confirmation. The compartment in and of itself was some evidence of the commission of a crime.[5] The fact that it was empty could mean it had been used for drug trafficking only at some point in the past. But it by no means negated the possibility that the car was currently being used to haul drugs or drug proceeds. And when considered with the unusual circumstances of defendant's trip – not knowing who owned the car, acquiring it for a spur-of-the-moment trip from California to an unspecified location in Minnesota, the recent registration of the car to an unknown person in California who was not present, and the heavy use of air freshener – the totality of factors indicated a present use of the car for drug trafficking. The circumstances still raised a fair probability that drugs or evidence relating to drug trafficking would be found in the car. Whether such evidence might be in some other, better-concealed hidden compartment, or tucked away in some as yet unexamined nook or cranny of the vehicle could not be determined without a complete search. For example, Rose noted that screws had been tampered with on areas of the center

_____

[5] There was some testimony at the hearing about the "seizure" of the Sonata and taking an "inventory" of its contents at the garage. However, the court does not understand the Government to be arguing that the seizure of the car was justified under some forfeiture or impoundment law or that the search of the car and its contents was authorized under the inventory search exception.

console. Under the totality of circumstances, the officers still had probable cause to complete the search even after concluding that the hidden compartment under the seat was empty.

The decision to move the vehicle to the garage in Kinsley to complete the search was entirely reasonable. The recording of the stop makes clear it would have been dangerous and uncomfortable for the officers to do a thorough search out in the elements only a few feet from a busy highway, with cars and trucks traveling by at high speeds every few seconds. Cf. Chambers v. Maroney, 399 U.S. 42, 52, n.10 (1970) (it was not unreasonable for officers with probable cause to move the car to the police station to search it; it would be "impractical and perhaps not safe for the officers [where it was], and it would serve the owner's convenience ... to have the vehicle and the keys together at the station house."); United States v. Estrada, 459 F.3d 627, 634, n.7 (5th Cir. 2006) ("The officers do not need to obtain a warrant to move the vehicle from the roadside to a garage if there is probable cause to search a vehicle.").

As a practical matter, once the officers decided to move the car to Kinsley there was no doubt the defendant would have to go with them. She did not know anyone in the area and the officers could not reasonably leave her stranded on the highway in the bitter cold. She voiced no objection to going. But the officers did not ask if she would agree to accompany them and gave her no choice in the matter. They patted her down and directed her to Rose's patrol car without telling her where they were going. They were accompanied by several other patrol cars and officers, one of whom drove the Sonata. Although defendant was not handcuffed, a reasonable person would not have felt

free under the circumstances to do anything other than go with the officers and would have considered the degree of restraint indicated to be one consistent with an arrest, regardless of Rose's statement to her that she was not under arrest. The court concludes this involuntary transportation of the defendant for questioning at the County garage amounted to an arrest that required probable cause to believe she had committed a crime.[6] Cf. Kaupp v. Texas, 538 U.S. 626, 630 (2003) ("Such involuntary transport to a police station for questioning is 'sufficiently like arres[t] to invoke the traditional rule that arrests may constitutionally be made only on probable cause.'"); Arizona v. United States, 132 S.Ct. 2492, 2529 (2012) (Alito, J., concurring) ("Similarly, if a person is moved from the site of the stop, probable cause will likely be required."); Hayes v. Florida, 470 U.S. 811, 816 (1985) (line between detention and arrest "is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes.").

The same essential analysis discussed previously applies to probable cause to believe defendant had committed or was committing an offense. Cf. United States v. Estrada, 459 F.3d 627, 633 (5th Cir. 2006) (evidence of a hidden compartment supports probable cause "for a search/arrest."). The facts known to the officers showed that the car had been modified for transportation of contraband. The

---

[6] The Government has not argued that defendant went to the garage of her own volition or that the completion of the search at the garage was within the scope of defendant's consent to search given on the highway.

circumstances of defendant's travel and possession of the vehicle indicated a fair probability that she was involved in the use of the car for that purpose. Even though the false compartment was empty, the totality of circumstances gave rise to probable cause to believe the car contained contraband or other evidence of a crime and that defendant was committing or had committed a criminal offense. Under the circumstances it was not unreasonable to transport her to the garage.

E. <u>Miranda warnings</u>. Defendant concedes she was given Miranda warnings on the highway after Rose found the secret compartment, but argues her rights were violated when she was subsequently questioned at the garage without any additional warnings.

Rose gave defendant Miranda warnings at the roadside just before 3:00 p.m. The evidence shows defendant knowingly and voluntarily waived her rights and agreed to answer Rose's questions. She was taken to the garage at about 3:50 p.m., where she answered Rose's questions while other officers searched the Sonata. Once the drugs were found at about 4:10 p.m., Rose formally placed her under arrest and then continued to ask questions without any additional warnings. Defendant again responded to his questions.

Once a suspect has been given Miranda warnings, police need not repeat the warnings "unless the circumstances [have] changed so seriously  that his answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights." <u>See</u> <u>Wyrick v. Fields</u>, 459 U.S. 42, 47 (1982). Defendant was given Miranda warnings and waived her rights only an hour or so before she answered Rose's questions at the garage.

<u>Mitchell v. Gibson</u>, 262 F.3d 1036, 1057 (10th Cir. 2001) ("Numerous courts have rejected the argument that the passage of time alone invalidates previously given Miranda warnings."). She was in custody the entire time and was questioned by the same officer in both instances. The questions all related to the same subject matter. There was a change of locations but it was not so significant as to render her decision to answer questions at the garage involuntary or unknowing. The evidence shows defendant still understood her rights at the garage, as she later confirmed when she acknowledged that fact to Agent Brown and then declined to speak to him about the incident. The totality of circumstances shows that Trooper Rose's questioning at the garage did not violate defendant's rights under <u>Miranda</u>. <u>Cf</u>. <u>Mitchell</u>, 262 F.3d at 1058 (suspect who waived <u>Miranda</u> at outset of initially voluntary interview did not have his rights violated when police later failed to repeat the warnings after telling him he was in custody).

F. <u>Search of the travel bag</u>. Defendant argues that the travel bag in the Sonata was searched "without consent, probable cause, or a warrant," and the search did not otherwise fall within the search incident-to-arrest exception.

A defendant can establish standing to object to a search of personal items in a car even if she lacks standing to object to a search of the car. <u>See</u> <u>United States v. Worthon</u>, 520 F.3d 1173, 1182 (10th Cir. 2008). Giving defendant the benefit of the doubt that the slim evidence at the hearing showed she had a legitimate and reasonable expectation of privacy in the travel bag, the court nevertheless finds there was probable cause to search the vehicle and,

-23-

as a consequence, the officers had authority to search containers found in the car, including the travel bag. <u>California v. Acevedo</u>, 500 U.S. 565 (1991) (police may search containers found within automobile when they have probable cause that automobile contains contraband or evidence of a crime).

   G. <u>Search of cell phone</u>. Defendant argues the search of the cell phone violated her Fourth Amendment rights.[7] She relies primarily on a recent decision, <u>United States v. Wurie</u>, ___F.3d ___, 2013 WL 2129119 (1st Cir. 2013), which held that a warrantless search of cell phone data incident to arrest was invalid because it was not necessary to protect the arresting officers or to preserve destructible evidence. The Government contends the cell phone search was a permissible search incident to arrest, pointing out that a majority of courts addressing the issue have so ruled, including a leading Fifth Circuit case, <u>United States v. Finley</u>, 477 F.3d 479 (5th Cir. 2007), and an unpublished Tenth Circuit decision dealing with a § 1983 claim, <u>Silvan v. Briggs</u>, 309 Fed.Appx. 216 (10th Cir. 2009). At least two judges in this district have upheld searches of at least some cell phone contents incident to arrest. <u>United States v. Mercado-Nava</u>, 486 F.Supp.2d 1271 (D. Kan. 2007) (Crow, J.); <u>United States v. Espinoza</u>, 2007 WL 1018893 (D. Kan., Apr. 3, 1997) (Robinson, J.). <u>See</u> <u>also</u> <u>United States v. Rocha</u>, 2008 WL 4498950 (D. Kan. Oct. 2, 2008) (Rogers, J.) (search of cell phone contents proper under automobile exception); <u>Validity of Search of Wireless Communication Devices</u>, Marjorie A. Shields, 62 A.L.R.6th 161 (2011).

---

   [7] The Government has not argued that defendant lacks standing to challenge the search of the cell phone.

As a general matter, warrantless searches are considered "per se unreasonable" under the Fourth Amendment, subject only to a few specifically established exceptions. Arizona v. Gant, 556 U.S. 332, 338 (2009). One of those exceptions is a search incident to arrest. Under Chimel v. California, 395 U.S. 752 (1969), police making a lawful arrest may search the arrestee's person and the space within his immediate control, meaning the area from which he might gain possession of a weapon or destructible evidence. Gant, 556 U.S. at 339. This rule is justified by the need to remove any weapon the arrestee might seek to use to resist or escape and to prevent the concealment or destruction of evidence. As applied to the arrest of a recent occupant of a vehicle, the Chimel rule justifies a search of the passenger compartment of the car "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." Gant, 556 U.S. at 343. But the circumstances unique to a vehicle also justify the search of a vehicle recently occupied by the arrestee when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Gant, 556 U.S. at 343.

There is an initial obstacle to the Government's reliance on a search-incident-to-arrest in this case: defendant's cell phone was apparently in Trooper Rose's custody or control from the time the consent search began until the phone was downloaded by Agent Brown. At the time of defendant's arrest, the cell phone was not on her person or in a space within her immediate control. The Government cites no evidence showing a possibility that during the arrest or search defendant could have gained control of or access to the phone

and destroyed evidence on it. Under these circumstances <u>Chimel's</u> preservation of evidence rationale does not apply. Because the phone was removed from defendant – initially as a result of defendant voluntarily giving it to Rose and then by Rose retaining possession or control of it – any possibility that defendant could destroy evidence on it was eliminated. <u>Cf</u>. <u>Gant</u>, at 339 ("[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply."); <u>United States v. DiMarco</u>, 2013 WL 444764, (S.D.N.Y. 2013) ("Once DiMarco was in the custody of the NYPD and his cell phone removed from his possession, the justifications for the search incident to arrest exception disappeared.").

The Government seems to rely on <u>Gant</u>'s special rule for vehicles, which allows the search of a vehicle incident to arrest if there is reason to believe evidence of the crime of arrest will be found therein. The Government adds that [n]ot only did reason exist to search defendant's phone after the drugs were found, so did probable cause." (Doc. 20 at 15). As to the <u>Gant</u> rule, the evidence here did not show that the phone was in defendant's car when defendant was formally arrested at the garage. Rose had apparently seized it at some point during the roadside search.[8] Thus, the search of the phone's contents cannot be justified under the special <u>Gant</u> rule

---

[8] When defendant was transported by Rose to the garage, the two can be heard on the patrol car video commenting because the navigation feature of defendant's phone was still turned on and was audibly giving directions as Rose drove. No evidence was presented, however, that defendant could have gained access to the phone at that point or thereafter.

because an essential prerequisite is lacking: no showing has been made that the phone was in the car contemporaneously with the arrest. And even assuming there was probable cause to believe evidence of the offense would be found on the phone, as the Government contends, the court concludes for the reasons below that the examination of the phone's contents was still unreasonable.

In arguing that the search of the phone was proper, the Government relies in part on a theory of exigent circumstances because incriminating evidence on a phone "is information which can be easily erased." (Doc. 22 at 2). Courts have recognized that there is at least a potential for destruction of evidence on cell phones. As noted in United States v. Flores-Lopez, 670 F.3d 803, 808 (7th Cir. 2012), not only is it possible to configure a cell phone so the mere touch of a button instantly erases ("wipes") its contents and sends an emergency signal to a designated person, but the same thing can be accomplished remotely. Flores-Lopez, 670 F.3d at 808 ("remote wiping capability is available on all major cell-phone platforms" or can easily be acquired). So even when an arrestee does not have access to a phone, there is a possibility that evidence on it could be destroyed by third persons. This could include persons in an escort vehicle who see the stop or others who are alerted by some communication or lack thereof from the arrestee. There was no specific evidence of such a threat in the instant case, although the Government's witnesses said loss of evidence was a concern.

A threat of loss of evidence from third-persons does not fall under the search-incident-to-arrest exception, but rather under a general exception for imminent destruction of evidence. Exigent

circumstances, including a potential loss of evidence, may make a warrantless search reasonable if "there is a compelling need for official action and no time to secure a warrant." <u>Missouri v. McNeely</u>, 133 S.Ct. 1552 (2013). Unlike a search incident to arrest, however, a search pursuant to this exception has at least two additional requirements: first, the Government must show that the threatened destruction of evidence made it impractical to first obtain a search warrant. <u>Ker v. State of California</u>, 374 U.S. 23, 41-42 (1963). Second, the Government must show there was probable cause to believe the item or place searched contained evidence of a crime. <u>Cf</u>. <u>United States v. Place</u>, 462 U.S. 696, 701 (1983) (where police have probable cause to believe a container holds evidence of a crime, they may seize the property pending issuance of a warrant, if exigent circumstances require it). Because the Government relied on the search-incident-to-arrest exception in this case, it made no showing with respect to the feasibility of obtaining a warrant to search the phone.

Even assuming the officers had probable cause to believe evidence of a crime was on defendant's phone and that the potential for destruction of the evidence made it impractical to get a warrant before taking action, the evidence still fails to show that the actual search of the phone - i.e., examining the content of the text messages and photos – was justified by exigent circumstances. The facts of this case are that before examining these items the officers were able to copy them to a storage device. Doing so eliminated any real possibility that the evidence could be destroyed by an outside

agency.[9] At that point the claimed exigent circumstance no longer existed and there was no reason why the officers could not have obtained a warrant before proceeding to search through the information. This is made clear by the fact that the officers waited five days before actually examining the contents.

Requiring officers to seek a warrant under these circumstances is not only consistent with the general rule of exigent circumstances,[10] but also fully justified by the unique privacy concerns applicable to "smart" cell phones. A modern cell phone "is quite likely to contain, or provide ready access to, a vast body of personal data." Flores-Lopez, 670 F.3d 803, 805 (7th Cir. 2012); United States v. Wurie, ___F.3d. ___, 2013 WL 2129119, *7 (1st Cir. 2013) ("That information is, by and large, of a highly personal nature: photographs, videos, written and audio messages (text, email, and voicemail), contacts, calendar appointments, web search and browsing history, purchases, and financial and medical records."). Cell phones hold the modern equivalent of "papers and effects" which the Fourth Amendment was designed to protect from unwarranted and

---

[9] The First Circuit said officers could avoid destruction of evidence by three means: removing the phone's battery, using a "Faraday enclosure," [which prevent any transmissions from reaching the phone] or copying the contents. Wurie, 2013 WL 2129119, *9. The Seventh Circuit discussed these possibilities but also noted the burden on police from having "to traipse around with Faraday bags" or copying devices and be trained in the technical uses of these items. Flores-Lopez, 670 F.3d at 810.

[10] Cf. United States v. Place, 462 U.S. 696, 701 (1983) ("Where law enforcement authorities have probable cause to believe that a container holds ... evidence of a crime, but have not secured a warrant, [the Fourth Amendment permits] seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it....").

unchecked governmental intrusion. Cf. United States v. Otero, 563 F.3d 1127, 1132 (10th Cir. 2009) ("The modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs....").[11] Allowing unrestrained governmental searches through such personal data is contrary to the reasonable expectation of privacy most phone users would have – even those accused of a crime. Absent a showing of exigent circumstances – none of which were demonstrated here – it was unreasonable to search through the text messages and photos on the cell phone without first obtaining a warrant.

The Government argues this case is "very similar" to United States v. Curtis, 635 F.3d 704 (5th Cir.), cert. denied, 132 S.Ct. 191 (2011). Curtis involved the search of a cell phone that was taken from a defendant's car as he was being arrested. Police searched the

---

[11] There is also likely to be information on a cell phone as to which a user has no reasonable expectation of privacy. For example, phone users cannot reasonably expect that the numbers dialed on a phone will be kept private because phone companies track this information for various purposes, including billing and detecting improper use of phones. Smith v. Maryland, 442 U.S. 735 (1979). From Smith it follows that there would be no reasonable expectation of privacy in information "posted" by a phone user on a public website or otherwise shared widely with others. Smith reasoned that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." Smith, 442 U.S. at 743-44. But Smith's rationale should not be extended to the content of text messages even if such items were "turned over" in the sense of being transmitted through a phone or internet service provider. Even assuming a provider has access to such items, users still reasonably expect that the contents of their personal messages and records are not generally open to examination by third persons. They should be able to reasonably expect that the Government will not examine the recorded contents of their phone communications without exigent circumstances or a warrant authorizing a search.

phone's contents both as defendant was being arrested and later at the station. The defendant conceded the phone was within his reach at the time of arrest. <u>Curtis</u>, 635 F.3d at 712. As noted above, there is no evidence here that Ms. Aispuro's phone was within her reach either when she was arrested or when the search occurred, which distinguishes <u>Curtis</u> and takes this case out of the permissible scope of a <u>Chimel</u> search.

The Government also invokes the good faith exception to argue that the phone contents should not be suppressed even if the search was unlawful. <u>United States v. Leon</u>, 468 U.S. 897 (1984). The good faith rule provides that evidence from an unconstitutional search need not be suppressed "when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." <u>Leon</u>, 468 U.S. at 918. Good faith applied in <u>Curtis</u> because the search was lawful when it was conducted but was only later (arguably) made unlawful by the <u>Gant</u> ruling. That circumstance does not apply here; <u>Gant</u> was controlling at all times. The good-faith rule can also apply when a search "is objectively reasonable under the binding, settled case law of a United States Court of Appeals...." <u>United States v. Madden</u>, 682 F.3d 920, 926 (10th Cir. 2012). But the Tenth Circuit case on which the Government apparently relies for its good faith argument (<u>Silvan v. Briggs</u>, 309 Fed.Appx. 216 (10th Cir. 2009)) was clearly a search incident to arrest, not the search of an otherwise seized container and, in any event, was an unpublished non-precedential decision. <u>Cf</u>. <u>United States v. Burgess</u>, 576 F.3d 1078, 1090 (10th Cir. 2009) ("In spite of clear language in <u>Acevedo</u>, one might speculate whether the Supreme Court would treat laptop

computers, hard drives, flash drives or even cell phones as it has a briefcase or give those types of devices preferred status because of their unique ability to hold vast amounts of diverse personal information. Interesting as the issue may be, we need not now resolve it because the search of Burgess' hard drives was authorized by a warrant."). The Government cites no binding Circuit precedent finding a search under these circumstances to be lawful.

## IV. Conclusion

Defendant's Motion to Suppress (Doc. 17) is GRANTED with respect to text messages and photos obtained from the search of her cell phone; the motion is DENIED in all other respects.

IT IS SO ORDERED.

Dated this 24th day of July 2013, at Wichita, Kansas.

s/Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE